**In re James A. DINNAN, Appellant.**

**Maija S. BLAUBERGS, Plaintiff-Appellee,**

**v.**

**BOARD OF REGENTS OF the UNIVER-SITY SYSTEM OF GEORGIA, et al., Defendants,**

**James A. Dinnan, Movant-Appellant.**

**Nos. 80-7432, 80-7441.**

United States Court of Appeals, Fifth Circuit.* Unit B

Nov. 16, 1981.

Rehearing and Rehearing En Banc Denied Dec. 17, 1981.

John K. Larkins, Jr., Guy B. Scott, Jr., Athens, Ga., for movant-appellant.

J. Ralph Beaird, School of Law, Univ. of Ga., Athens, Ga., amicus curiae, for Ga. Assn. of Colleges.

Andrew H. Marshall, Henry & Marshall, Athens, Ga., for plaintiff-appellee.

Before SIMPSON, RONEY and THOM-AS A. CLARK, Circuit Judges.

* Former Fifth Circuit case, Section 9(1) of Public Law 96-452—October 14, 1980.

THOMAS A. CLARK, Circuit Judge:

The instant action arises from a suit brought by Maija Blaubergs against the Board of Regents of the University of Georgia and others. This suit alleges, *inter alia*, that she was unlawfully denied promotion to the rank of associate professor and that her employment had been unconstitutionally terminated. During the course of discovery, on April 18, 1980, the deposition of Professor James A. Dinnan was taken. This deposition related to his service on the College of Education Promotion Review Committee that considered Blaubergs' application for promotion during the 1979–80 academic year. When asked how he voted on the application, Dinnan refused to answer.

The appellee then filed a motion for an order compelling discovery. After a hearing on the issue, the court ordered the appellant to testify. The deposition continued on May 23, 1980, and Dinnan reiterated his refusal to answer any question regarding his vote. The appellee thereupon filed a motion for the imposition of contempt sanctions against Dinnan. On June 2, 1980, the court held a hearing to consider the appellee's motion, and informed Dinnan that it intended to proceed against him at a hearing the next day.

The court heard the appellant's arguments on June 3, and thereafter held him in contempt. He was ordered to pay a fine of one hundred dollars per day for thirty days and if he persisted in his defiance of the court order he was to report for a ninety-day term of imprisonment. However, the order was framed to allow an immediate cessation of the fine and imprisonment if Dinnan came forward with the desired information. A motion to stay sentence was denied, and a notice of appeal filed. Immediately thereafter, Dinnan filed a motion under 28 U.S.C. § 2255 alleging an illegal sentence and a denial of due process. The motion was denied on the basis that this was a civil, not a criminal, proceeding and that there was adequate notice. Notices of appeal from the court's order compelling discovery and from the court order finding him in contempt have been consolidated in the instant action.

The appellant argues that the instant case is one of "academic freedom." We, however, are unable to accept this characterization and, indeed, believe that any such view of the present case requires a gross distortion of its facts.

This case simply involves the law of evidence; there are no issues of constitutional dimension raised. The appellant is claiming a privilege, *i. e.*, a right to refrain from testifying, that heretofore has not been considered or recognized by any court. The issue before this court then is whether the privilege claimed by the appellant should be endorsed by this circuit.

We hold that no privilege exists that would enable Professor Dinnan to withhold information regarding his vote on the promotion of the appellee. This result is required on the basis of fundamental principles of law and sound public policy.

The appellant basically contends that he has the privilege not to testify in the proceedings below because he is sheltered by an "academic freedom privilege." Before discussing this argument, it is necessary to review briefly the philosophic principles that gave rise to the privileges that presently exist. As a preliminary consideration, however, it must be kept in mind that while the law consists of a framework of legislative actions, judicial precedent, and moral considerations, virtually every judicial inquiry begins with the goal of developing the facts. The basis of justice is the truth and our system frowns upon impediments to ascertaining that truth. This need to develop the facts if the judicial system is to function is summarized by Wigmore:

> From the point of view of society's *right* to our testimony, it is to be remembered that the demand comes, not from any one person or set of persons, but from the community as a whole—from justice as an institution and from law and order as indispensable elements of civilized life . . . . The whole life of the community, the regularity and continuity of its

relations, depends upon the coming of the witness. Whether the achievements of the past shall be preserved, the energy of the present kept alive, and the ambitions of the future realized depends upon whether the daily business of regulating rights and redressing wrongs shall continue without a moment's abatement, or shall suffer a fatal cessation. The business of the particular cause is petty and personal, but the results that hang upon it are universal. The vital process of justice must continue unceasingly. A single cessation typifies the prostration of society. A series would involve its dissolution. The pettiness and personality of the individual trial disappear when we reflect that our duty to bear testimony runs not to the parties in the present cause, but to the community at large and forever.[1]

A privilege is the right not to give testimony. The most fundamental privilege is constitutionally protected, the privilege against self-incrimination. That privilege came about as a reaction to the practice of extracting confessions by means of the rack and whip, by subjecting the prisoner's family to harm, and by a variety of other means. Our system, while dedicated to a discovery of the truth, subjugates that dedication to the principle that a person shall not be compelled to testify against himself.[2]

Our common law has established other privileges. A businessman, a taxpayer, or an accused may discuss freely with an attorney of his choice the problem that may subject him to liability for a debt, taxes, or a crime. Conversations between a person and his attorney are protected by the privilege. The basis for this privilege is a societal judgment that one should have the right to seek legal advice free from the fear that conversations with his attorney will be used against him. Without that privilege, a client would not be motivated to tell the attorney the whole truth and, in turn, the attorney would be unable to give the appropriate advice. Our system deems this relationship worth protecting.[3]

The law also has extended the privilege not to testify to a priest or other religious leader who has heard the confession of a penitent. This privilege has its basis in the societal judgment that a person should be permitted to seek his peace with God, as well as the idea that to compel such testimony would violate church discipline and thereby infringe upon religious liberty.[4] The law has accorded a privilege to spouses on a theory that confidences extended by one spouse to the other should be privileged from judicial inquiry so that marital harmony will not be destroyed.[5] Likewise, a physician-patient privilege exists in order to insure that one is not penalized for seeking medical help.[6]

There are other types of privileges that might be classified as qualified privileges. One example is the "work product" privilege.[7] Usually, a party to litigation does not have to discuss facts developed by him

1.  8 Wigmore on Evidence § 2192 (McNaughton ed. 1961).

2.  *See* 8 Wigmore on Evidence § 2250 (McNaughton ed. 1961); C. McCormick, Handbook on the Law of Evidence §§ 114–18 (2d ed. 1972).

3.  *See* C. McCormick, Handbook on the Law of Evidence §§ 87–88 (2d ed. 1972); J. Weinstein & M. Berger, 2 Weinstein's Evidence § 503[02] (1980); 8 Wigmore on Evidence § 2290 (McNaughton ed. 1961).

4.  *See* J. Weinstein & M. Berger, 2 Weinstein's Evidence § 506[02] (1980); C. McCormick, Handbook on the Law of Evidence § 77 (2d ed. 1972); 8 Wigmore on Evidence § 2394 (McNaughton ed. 1961).

5.  *See* 8 Wigmore on Evidence § 2218 (McNaughton ed. 1961); J. Weinstein & M. Berger, Weinstein's Evidence § 505[02] (1980); C. McCormick, Handbook on the Law of Evidence § 78 (2d ed. 1972).

6.  *See* 8 Wigmore on Evidence § 2380 (McNaughton ed. 1961); C. McCormick, Handbook on the Law of Evidence § 98 (2d ed. 1972); J. Weinstein & M. Berger, 2 Weinstein's Evidence § 504 (1980).

7.  *See Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 9 L.Ed. 451 (1947). *See also* Fed.R.Civ.P. 26.

or his lawyer regarding the case if such facts can be equally developed by the other side.[8] This can be likened to a patent privilege where one party has done the work to develop a product and others are not permitted to replicate it. However, in the case of the work product privilege, if information secured by one party or his attorney is not available for some reason to the other party, our courts require that such information be divulged on the theory that the truth must be discovered unless there is some overwhelming philosophic basis for denying access to that information.[9] A privilege of this sort requires a balancing of the interests involved in every application of it. However, it should be remembered that most of these privileges have exceptions.

Privileges are based upon the idea that certain societal values are more important than the search for truth. There is no question that the doctrine of privilege or immunity from testifying has been narrowly proscribed. A leading commentator on the law of evidence has remarked:

> There must be good reason, plainly shown, for their [privileges] existence. In the interest of developing scientifically the details of the various recognized privileges, judges and lawyers are apt to forget their exceptional nature. The presumption against their extension is not observed in spirit. The trend of the day is to extend them as if they were large and fundamental principles, worthy of pursuit into the remotest analogies. This attitude is an unwholesome one. The investigation of truth and enforcement of testimonial duty demand the restriction,

not the expansion of these privileges. They should be recognized only within the narrowest limits required by principle. Every step beyond these limits helps to provide, without any real necessity, an obstacle to the administration of justice.[10]

Recently, reasoning along these lines has carried the day and judge-made privileges have fallen into disfavor.[11] In recent times, commentators have tended to view privileges as hindering litigation and have generally advocated a narrowing of the field.[12] While a number of new privileges have been established recently, they generally have been statutorily created.[13]

The appellant correctly observes that the Federal Rules of Evidence allow the judicial creation of new privileges. Indeed, in the absence of a constitutional or statutory mandate, this court is charged to examine a claimed new privilege under the "principles of the common law, . . . in light of reason and experience."[14] Congress in enacting Federal Rule of Evidence 501 "manifested an affirmative intention not to freeze the law of privilege."[15] Instead it intended to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis."[16]

In line with this, the Supreme Court has recently stated, "privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence' [citations omitted]." As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all ration-

---

**8.** *See* C. McCormick, Handbook on the Law of Evidence § 96 (2d ed. 1972); C. Wright & A. Miller, Federal Practice and Procedure § 2021 (1970).

**9.** *See* C. Wright & A. Miller, Federal Practice and Procedure § 2025 (1970).

**10.** 8 Wigmore on Evidence § 2192 (McNaughton ed. 1961).

**11.** C. McCormick, Handbook on the Law of Evidence § 77 (2d ed. 1972).

**12.** *Id.*

**13.** *Id.*

**14.** Fed.R.Evid. 501.

**15.** *Trammel v. United States*, 445 U.S. 40, 48, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980).

**16.** *Id.*

**430**

al means for ascertaining truth." [17] Explicitly addressing the issue of the establishment of new privileges, the Supreme Court has stated that "exceptions to the demand for every man's evidence *are not lightly created* nor expansively construed, for they are in derogation of the search for truth." [18] Thus, where there is no compelling justification for a new privilege, the vital truth-seeking function of our justice system must carry the day.

Bearing in mind that there has been a notable hostility on the part of the judiciary to recognizing new privileges [19] and that the public policy served by a new privilege must transcend the normally dominant truth-seeking considerations, we turn to the privilege claim brought forth in the instant case. The appellant argues that the new privilege is necessary to protect two important societal interests, "academic freedom" and the "secret ballot." We find neither argument to be even slightly persuasive; we will examine the former contention first.

■ The appellant urges us to establish an evidentiary privilege in the instant case in order that "academic freedom" might be protected. The appellant construes the term "academic freedom" to include more than it does. Unquestionably, academic freedom is one of the paramount values of this Republic. However, if the concept is expanded too far it can cause other important societal goals (such as the elimination of discrimination in employment decisions) to be frustrated. Indeed, if the concept were extended as far as the appellant argues, it would rapidly become a double-edged sword threatening the very core of values that it now protects.

Academic freedom is "of transcendent value to all of us and not merely to the teachers concerned." · *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). Time after time the

Supreme Court has upheld academic freedom in the face of government pressure. *See, e. g., Cramp v. Board of Public Instruction*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). However, in all those cases there was an *attempt to suppress ideas by the government*. Ideas *may be suppressed just as effectively by denying tenure as by prohibiting the teaching of certain courses*. Quite bluntly, this Court feels that the government should stay out of academic affairs. However, these issues are not presented in the instant case. Here a *private* plaintiff is attempting to enforce her constitutional and statutory rights in an employment situation. Therefore, the reasoning behind the cited cases simply does not apply here.

Passages are presented to the Court from *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and *Kunda v. Muhlenberg College*, 621 F.2d 532 (3d Cir. 1980), to support the appellant's contentions. Both these quotations carry the seeds of destruction of the appellant's argument within them. From *Bakke*, the appellant quotes:

Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment. The freedom of a university to make its own judgments as to education includes the selection of its student body. Mr. Justice Frankfurter summarized the "four essential freedoms" that comprise academic freedom:

"It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail "the four essential

---

17. Trammel v. United States, 445 U.S. at 49, 100 S.Ct. at 912 (1980).

18. *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (emphasis added).

19. *See, e. g.*, C. McCormick, Handbook on the Law of Evidence § 77 (2d ed. 1972).

freedoms" of a university—to determine for itself *on academic grounds* who may teach, what may be taught, how it shall be taught, and who may be admitted to study."

438 U.S. at 312, 98 S.Ct. at 2759. Here, however, we have an allegation that the University of Georgia decided a tenure application *on other than academic grounds*, which clearly takes it outside of what the *Bakke* Court envisioned to be the limits of academic freedom. Indeed, the excerpt from *Kunda v. Muhlenberg College* that the appellant urges upon us as persuasive authority is even more damning to his cause:

It is beyond cavil that generally faculty employment decisions comprehend discretionary academic determinations which do entail review of the intellectual work product of the candidate. That decision is most effectively made within the university and although there may be tension between the faculty and the administration on their relative roles and responsibilities, it is generally acknowledged that the faculty has at least the initial, if not the primary, responsibility for judging candidates. "The peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1346 (W.D. Pa.1977).

Wherever the responsibility lies within the institution, it is clear that courts must be vigilant not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, *and unless they can be shown to have been used as a mechanism to obscure discrimination*, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

621 F.2d at 547–48 (emphasis added). Here the allegation is that the appellee *was discriminated against*, precisely the situation that the Third Circuit envisioned in *Kunda v. Muhlenberg College* in which courts should intervene. Thus, the authority relied upon by the appellant does not, upon close scrutiny, support his position.

The appellant is frustrating the appellee's attempt to vindicate an alleged infringement of her statutory and constitutional rights. Though the case is one involving an alleged case of sex discrimination, admittedly a cause of action not especially favored by some groups at the present time, its implications are staggering. Using the appellant's logic, if a tenure committee attempted to stop the promotion of all faculty members who were not pro-abortionists, a right-to-life music professor's attempt at discovery could be barred by the concept of "academic freedom." Likewise, a physicist's application might be sabotaged because he opposed the cession of the Panama Canal where such a position was not favored by the committee. In all these cases, "academic freedom" would shield the tenure committee from having to reveal its votes, even though the decision had nothing to do with any academic grounds. In every one of these scenarios, the rights of the applicant would be infringed upon, but "academic freedom" would serve to obstruct the vindication of these rights. This possibility is a much greater threat to our liberty and academic freedom than the compulsion of discovery in the instant case.

Though we recognize the importance of academic freedom, we must also recognize its limits. The public policy of the United States prohibits discrimination; Professor Dinnan and the University of Georgia are not above that policy. To rule otherwise would mean that the concept of academic freedom would give any institution of higher learning a *carte blanche* to practice discrimination of all types.

The appellant further claims that there is a common law privilege designed to protect the secret ballot, and that since Dinnan's vote was made by secret ballot it is protect-

ed. This claim is unconvincing. The only cases which the appellant cites [20] deal either with the political process or with labor union elections (which are sufficiently close to the political process to justify their inclusion within that category).[21] This alone effectively distinguishes those cases from that before the court at the present time. In the instant case we simply have an employment decision, which by no stretch of the imagination deserves the protection that is accorded to individual participation in the political process.

■ Further, the reason ballots are kept secret is to encourage individuals to vote in political and politically-related elections. Society has a strong interest in encouraging all individuals, even the most timid, to vote. If an individual's ballot was not privileged, the policy of the secret ballot could be frustrated easily.[22] Further, a victorious politician, labor union, or employer would be able to commit reprisals against the individual.[23] In the instant case, society has no strong interest in encouraging timid faculty members to serve on tenure committees. Additionally, this court is unconvinced that an applicant who is denied tenure can retaliate against tenured faculty members. Therefore, the reasoning that protects political and labor election ballots from discovery is inapplicable here. Thus, we find absolutely no merit in the claim of a secret ballot privilege.

The appellant essentially argues that an institution of higher learning has the untrammelled right to grant tenure to whomever it pleases. He maintains that an evidentiary privilege is necessary to protect this right. Dinnan contends that the university decision-makers will be inhibited in making tenure decisions if there is a possibility that committee members will be required to reveal their votes. We do not believe that this justifies the creation of a new privilege. We fail to see how, if a tenure committee is acting in good faith, our decision today will adversely affect its decision-making process. Indeed, this opinion should work to reinforce responsible decision-making in tenure questions as it sends out a clear signal to would-be wrongdoers that they may not hide behind "academic freedom" to avoid responsibility for their actions.

No one compelled Professor Dinnan to take part in the tenure decision process. Persons occupying positions of responsibility, like Dinnan, often must make difficult decisions. The consequence of such responsibility is that occasionally the decision-maker will be called upon to explain his actions. In such a case, he must have the courage to stand up and publicly account for his decision. If that means that a few weak-willed individuals will be deterred from serving in positions of public trust, so be it; society is better off without their services. If the decision-maker has acted for legitimate reasons, he has nothing to fear. We find nothing heroic or noble about the appellant's position; we see only an attempt to avoid responsibility for his actions. If the appellant was unwilling to accept responsibility for his actions, he should never have taken part in the tenure decision-making process. However, once he accepted such a role of public trust, he subjected himself to explaining to the public and any affected individual his decisions and the reasons behind them.

Since neither academic freedom nor any valid secret ballot consideration is raised in the instant case, the truth-seeking function

---

20. See, e. g., Johnston v. Charleston, 1 S.C.L. (1 Bay) 441 (1795); Royal Lumber Company, 118 N.L.R.B. 1015 (1957).

21. See J. Weinstein & M. Berger, 2 Weinstein's Evidence § 507[03] (1980).

22. See 8 Wigmore on Evidence § 2214 (McNaughton ed. 1961); J. Weinstein & M. Berger, 2 Weinstein's Evidence § 507[02] (1980).

23. See, e. g., "[C]ompelling them to declare for whom they gave their votes, ... was a kind of inquisitorial power unknown to the principles of our government and constitution, and might be highly injurious to the suffrages of a free people as well as tending to create cabals and disturbances between contending parties in popular elections." 1 S.C.L. (1 Bay) 441, 442 (S.C.1795).

of our system of justice must prevail over the novel privilege claimed by the appellant. Thus, since the matters sought in discovery were relevant to the claim, the district court's order compelling discovery and the contempt order against Professor Dinnan were proper.

The appellant also raises a number of issues arising out of the trial judge's characterization of the contempt and whether adequate notice was given for the appellant to present an adequate defense below. These issues were already disposed of by another panel of this court, *In re Dinnan*, 625 F.2d 1146 (5th Cir. 1980). The court there decided that the contempt was civil, the sentence was constitutional, and that Dinnan was given adequate notice to prepare his defense. Those issues cannot be re-litigated in this appeal.

Accordingly, the district court's orders compelling discovery and holding the appellant in contempt are AFFIRMED.