Charles L. TOLLIVER, Plaintiff,

v.

J.R. YEARGAN, James E. Halligan, Charles W. Oxford, James E. Martin and the University of Arkansas, Defendants.

No. 82–5007.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

June 2, 1983.

---

Richard Quiggle, Little Rock, Ark., for plaintiff.

David A. Stewart, Associate Counsel, University of Ark., and Nelwyn Davis, Asst. Atty. Gen., Little Rock, Ark., for defendants.

MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

This action was filed by Plaintiff, Dr. Charles L. Tolliver, against the University

of Arkansas and various faculty and administrative personnel, specifically Dr. J.R. Yeargan, Dr. James E. Halligan, Dr. Charles Oxford and Dr. James E. Martin, alleging violations of 42 U.S.C. §§ 1983, 2000e and the Fourteenth Amendment. Specifically, Plaintiff alleges that conditions and terms of his employment and compensation were discriminatory.

Jurisdiction of this Court is invoked and established pursuant to 28 U.S.C. § 1343, 42 U.S.C. §§ 1981, 1983, 2000e *et seq.* Venue is proper in this district and division.

The following shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.C.P.

## I. *Findings of Fact*

Plaintiff, Dr. Charles L. Tolliver, is currently a tenured Associate Professor in the Electrical Engineering Department of the College of Engineering of the University of Arkansas, Fayetteville campus.

After visiting the University campus during spring break of 1976, Plaintiff was hired as a faculty member on a twelve-month contract. All other regular faculty members are and were on a nine-month contract.

Twenty-five percent of Plaintiff's contract time was to be devoted to minority affairs and recruitment during the summer. Twenty-five percent of Plaintiff's salary for the first year was donated by private industry for assistance in hiring minority faculty.

Plaintiff was extended tenure after his first year as a faculty member. In February of 1977, Dr. J.R. Yeargan assumed the Chair of the Electrical Engineering Department, with the responsibility of evaluating faculty and making salary recommendations for the department.

Salary raises are based upon the performance of each faculty member for each year as well as cumulative past performance. Areas of evaluation include teaching, research, and service.

Based upon Dr. Yeargan's evaluation of Plaintiff, Plaintiff received the following pay raises for the 1977–78 to 1982–83 school years:

| | |
|---|---|
| 1977–78 | 7% |
| 1978–79 | 9% |
| 1979–80 | 5% |
| 1980–81 | 8% |
| 1981–82 | 9.7% |
| 1982–83 | 6.2% |

Plaintiff's raises were generally lower than a majority of the department faculty, but higher than at least one of the department faculty. All other faculty members within the department are white.

Those white faculty members who received higher percentage raises received superior evaluations. Plaintiff's salary increases are comparable to the raises of white faculty members with similar evaluations.

The percentage raises are determined by the total budget for salaries within the department, then apportioned to the individual faculty members according to the evaluations.

Plaintiff's contract was reduced to a nine-month contract in 1980–81, after private funding diminished, in conformity with the other faculty in the department.

Plaintiff was evaluated as "good" in the service area, particularly with respect to his contribution to minority student recruitment and retention.

Plaintiff's teaching load was "average" for the most part, never excessive, and on occasional semesters was comparatively light.

Plaintiff has never submitted any research proposals in his area of academic specialty, rather all of his proposals have been in the area of minority affairs.

Plaintiff has never submitted any manuscripts for publication in referred journals, although encouraged to do so.

Numerous student complaints were received concerning Plaintiff's competency and effectiveness as a teacher. No evidence was adduced that other teachers within the department received such complaints.

The evaluation process used in the department was uniformly applied to all members of the faculty in the department. Research, publishing and new course development are valid and relevant factors to be considered by the department in formulating the faculty evaluations.

Because of the rapid development of the state of the science, research and publishing take on more importance in electrical engineering than in some other fields.

The criteria by which Plaintiff and the other faculty members in the department were uniformly evaluated are legitimate and job-related.

Dr. Halligan, Vice-Chancellor of Academic Affairs, testified that even though Plaintiff's contract was reduced to nine months, Plaintiff has worked twelve months every year. Dr. Halligan testified further that this normally results in an increased salary because a salary for a nine month contract is 80% of a salary for a twelve month contract, and a summer contract pays an additional 33%.

Plaintiff has not demonstrated a *prima facie* case of racial discrimination.

Plaintiff has failed to show that his work environment was sufficiently pervasively discriminatory and offensive either in scope or extent.

Defendants have articulated legitimate non-discriminatory reasons for the actions taken, and Plaintiff has failed to show that these reasons are pretextual.

II. *Discussion*

Plaintiff alleges three principal areas of discriminatory treatment. These are (1) The reduction of Plaintiff's appointment from a twelve-month to a nine-month contract; (2) The salary increases Plaintiff received; and (3) Racial harassment. Each will be addressed in turn.

A. *The Contract Reduction*

Plaintiff was hired as a full associate professor of Electrical Engineering in 1976 and extended tenure a year later. In this regard Plaintiff was given preferential treatment in that it normally requires several years for one to be extended an associate professorship.

One of the principal reasons Plaintiff was hired was to assist the University in recruiting black engineering students to meet its desegregation goals. Plaintiff asserts that it was material to Plaintiff that he be hired on a twelve-month contract because he had twelve-month contracts in private industry. Exactly why it is more material to Plaintiff than to any other person who might consider leaving private industry for a teaching position is unknown.

Plaintiff argues that Defendants have failed to articulate a legitimate, non-discriminatory reason for the reduction.

The fact of the matter, however, is that the extension of a twelve-month contract and an associate professorship to a new faculty member is the rare exception rather than rule. Plaintiff's complaint in this regard is, in essence, that the University did not continue to extend him preferential treatment.

The Court is not convinced that once preferential treatment is extended to a member of a minority, the law forbids states or employers to thereafter reduce the minority member to an equal par with members of the majority, even if there is no reason for the "reduction". See *Walls v. Miss. St. Dept. of Pub. Welfare,* 542 F.Supp. 281 (D.Miss.1982); *Murphy v. Middletown Enlarged City Sch. Dist.,* 525 F.Supp. 678 (D.N.Y.1981). However, even if such is the law, which the Court very seriously doubts, the University had legitimate, non-discriminatory reasons for the reduction, i.e. that funding from private sources donated specifically for this purpose was reduced.

Faced with a reduction in funding for this purpose, i.e. "soft" funding, surely the University is not compelled to perpetually maintain Plaintiff's preferential status to the detriment of other faculty members or departments. See *U.S. v. Jacksonville Termin. Co.,* 451 F.2d 418 (11th Cir.1971).

Further, although technically reduced to a nine-month contract, Plaintiff has in fact

worked twelve months every year, which Dr. Halligan testified was potentially more advantageous than a straight twelve-month contract.

Plaintiff argues that an *ad hoc* committee called for the purpose of considering his contract—"reduction" grievance sustained Plaintiff's charges "in every regard." It is true that the committee found that there had been no evidence indicating changes in duties, assignments, or responsibilities requiring such a change, however, as noted, it was not Plaintiff's duties, necessarily, which necessitated or prompted the change but, rather, a reduction in private funding.

It is also true that Dr. Brenda Mobley, a member of the *ad hoc* committee, testified that the committee found no concrete evidence of racial discrimination, and no obvious pattern of harassment, but that the overall "attitude" of the University needed to improve.

■ The Court concludes that Plaintiff's change in status from a twelve-month employee to a nine-month employee raises no implication of discriminatory treatment by the University and that Plaintiff has failed to meet his burden of proof as to this issue.

## B. *The Salary Increases*

■ Plaintiff's first witness was Dr. Alan Marks, statistical analyst. Dr. Marks testified on direct examination that, based upon a procedure known as regression analysis, Plaintiff was evaluated according to different criteria with respect to salary increases than were his white counterparts.

The evidence reflects that Plaintiff's salary increases for the six academic years were as follows:

| | |
|---|---|
| 1977–78 | 7% |
| 1978–79 | 9% |
| 1979–80 | 5% |
| 1980–81 | 8% |
| 1981–82 | 9.7% |
| 1982–83 | 6.2% |

Simply stated, Dr. Marks' testimony was that, if various variables such as teaching load, grant applications, publications, service, etc., were actually employed by the University in formulating recommendations of salary increases, then Plaintiff should have received larger increases. By use of regression analysis Dr. Marks postulated that certain of these variables must have had a dispositive influence, in any given year, upon the recommendations of salary increase, in order for the increases to be consistent with one another and "make sense". Dr. Marks concluded that in different years of study, different factors had varying weight. Dr. Marks was of the opinion that his assumptions lead one to conclude that in several years the amount of teaching done had a negative effect on salary increases, and that in some years the number of grants applied for had a positive effect on the salary increases.

Initially we note that in year two, the 1978–79 academic year, Plaintiff received a higher than average salary increase, and received an amount in *excess of* the amount that Dr. Marks postulated Plaintiff should have received had he been evaluated fairly. Dr. Marks felt that this was evidence of *reverse* discrimination in favor of Plaintiff against the white members of the faculty.

Although the Court recognizes the value of statistical analysis in identifying a pattern of racial discrimination in some cases, for several reasons it is not persuasive here.

First, Dr. Marks concluded that even if Plaintiff did nothing at all except devote his attention to minority recruitment, this is, nonetheless, no justification for Plaintiff receiving smaller raises than other members of the faculty who may have taught a full load, received funding, published, and engaged in service. Indeed, this suggests that Dr. Marks was of the opinion that Plaintiff *should* have been evaluated by different criteria than the others.

Secondly, although Dr. Marks testified that his assumed variables were generally the same from school to school, he further admitted that the *weight* given to each variable by any particular school may well vary from school to school and year to year. Dr. Marks admitted that he had no knowledge as to the actual weight given each

variable at the University of Arkansas. As Dr. Marks' conclusion failed to consider that certain variables may be validly weighted more heavily than the others, his conclusions based upon unweighted criteria are little more than conjecture. Dr. Marks essentially admitted that if his assumptions as to the criteria used or their weight are inaccurate, then the results would also be inaccurate.

Thirdly, Dr. Marks' assumed criteria were based on *dollar* increases while the actual raises were based on *percentages* of increase. Dr. Marks testified in this regard that salary increases based upon percentages are inherently discriminatory. Thus, if an experienced faculty member earning $40,000.00 per year received a 10% raise, obviously the salary for the next year would be $4,000.00 higher. If a newer faculty member earning $30,000.00 per year received a similar evaluation and identical percentage raise the salary for the following year would increase $3,000.00. Dr. Marks' model would "seek" a "justification" of the $1,000.00 disparity. If the experienced member taught fewer courses and published while the newer member engaged in extensive service with a full load, Dr. Marks' model might well conclude that course load and service are inversely proportional to salary increases while publication is directly proportional to increase in salary, when, in fact, both members were qualitatively evaluated identically overall. When compared to a third faculty member, this hypothesis might not "pan out" in the computer, leading an analyst to the conclusion that the newer member was not evaluated according to the same standards as the others and that some other factor, i.e. race, was the true determinative criteria.

Fourthly, Dr. Marks admitted that subjective qualitative evaluations are valid factors to consider by the University, but such were not included in his model. Indeed, Dr. Marks testified that none of the *individual* criterion included in his model has any racial impact. Only when taken as a whole simultaneously did Dr. Marks conclude that a racial impact is present. This disparity, if any, can be accounted for by evaluations as to quality of work performed. Further from Dr. Marks' model, there were discrepancies between the projected salaries among whites and the actual salaries among whites.

Finally, Dr. Marks testified that if some of Plaintiff's seven funding proposals were regarded as repetitive by the University such that only three different proposals were considered submitted, this would affect the projection of Plaintiff's salary according to the model by decreasing the projection $680.00. This would decrease the mean disparity for that year by $290.00, which Dr. Marks testified was not statistically significant. Plaintiff presented no evidence as to the effect of the projections should the funding proposals of white faculty members also be considered multiplicious by the University.

Thus, as interesting as Dr. Marks' testimony was, such a model simply does not work well when valid subjective factors are actually validly employed by the University, and when raises are based on percentages.

Furthermore, the University presented a great deal of evidence that Plaintiff's salary increases were influenced by his repeated failure to engage in sufficient scholarly research and the quality of his teaching. Plaintiff maintains that he was excused from the research requirement and that his activities with respect to the procurement of grants and recruiting should be counted as research.

Dr. Charles Leone testified that, initially, Plaintiff was not required to do research, but that he could if he desired. It is the position of the University that all faculty members are to be encouraged to do research and that research is necessary to retain pay raises commensurate with the rest of the faculty.

Dr. Leone testified that Plaintiff's three-month summer was to be devoted to recruiting, the remainder of the year for teaching and research. Dr. Leone was emphatic that recruitment was not a substitute for research.

Plaintiff admitted that he published nothing since he began his employment at the University. This was noted in his evaluation. It was also noted that Plaintiff has developed no new courses. Plaintiff testified that he did develop a course but that it was cancelled because no student would sign up. In any event Plaintiff taught no new courses which he developed.

Dr. Heiple testified that Plaintiff's trips to the University of Arkansas at Pine Bluff in the minority program declined and that after two years, Plaintiff was asked not to come back to the Pine Bluff campus by administrators there.

Dr. Heiple further testified that to his knowledge there was no agreement with Plaintiff that his service in minority affairs would replace all duties of research. Dr. Heiple stated that Plaintiff was assigned additional teaching duties to compensate for his relatively light duties elsewhere.

Dr. Halligan testified that numerous student complaints concerning the quality of Plaintiff's teaching were received, and that difficulties with students is a valid factor to consider in salary recommendations. Dr. Halligan agreed with Dr. Leone that research does not normally constitute or comprise activity such as minority programs.

Dr. Neil Schmidt, head of the Electrical Engineering Department, testified that he told Plaintiff, subsequent to Plaintiff's return to the University, to pursue contacts and leads for research developed at Prairie View A and M while on a year's leave of absence. Plaintiff later said he was unable to get funding or do research by himself.

Dr. Schmidt rated Plaintiff's teaching performance unsatisfactory because of student complaints, the lack of positive input, and the lack of significant contribution to the program. Plaintiff was rated unsatisfactory in research because of the lack of publication or funding of a substantive nature. Plaintiff was, however, regarded as excellent in service.

Judith Dobbs, a former student of Plaintiff, testified that Plaintiff was unable to teach effectively, was vague and unable to make himself clear. Of the approximately thirty teachers Ms. Dobbs had in her academic career, she evaluated Plaintiff as the "worst".

Rodney Hamlin, a graduate teaching assistant assigned to Plaintiff, testified that one of his duties was to assist Plaintiff in revising a lab manual. Mr. Hamlin said that Plaintiff was constantly unavailable to him and offered no ideas or guidance toward preparing the lab manual. In April of that year, Plaintiff unexpectedly confronted Mr. Hamlin and demanded the completed lab manual in publishable form. Mr. Hamlin offered a draft which he had gratuitously written the previous year which Plaintiff refused because it was not in final publishable form. Plaintiff threatened Mr. Hamlin with termination of his assistantship and inclusion of a letter in his file to potential future employers to the effect that Mr. Hamlin was incompetent. Plaintiff told Mr. Hamlin that Dr. Yeargan concurred in Plaintiff's decisions. Mr. Hamlin confronted Dr. Yeargan. Dr. Yeargan told Mr. Hamlin that Plaintiff had not consulted him, that he did not concur with Plaintiff's judgment, and that he would also place a letter in Mr. Hamlin's file to offset that of Plaintiff should Plaintiff carry out his threats.

Dr. Yeargan testified that problems began to develop in May of 1979 when Plaintiff left town for the second time without making prior arrangements, whereupon Dr. Yeargan had to administer final examinations to one of Plaintiff's classes. At this time Dr. Yeargan noticed that the examination was identical to one given to a prior section, which Dr. Yeargan regarded as a serious breach of security and very unprofessional. When Dr. Yeargan discussed the matter with Plaintiff, Plaintiff began to cry and declared that his next year's salary was not acceptable.

Dr. Yeargan was of the opinion that Plaintiff had made a good start with the University but as time progressed Plaintiff performed rather poorly and was not making adequate progress toward the level of

performance expected from a faculty member holding a full professorship.

Although Plaintiff said he tried to develop a course in solid state technology which Dr. Yeargan cancelled because of a lack of student interest, Dr. Yeargan said that Plaintiff failed to submit requisite forms, timely course outlines, and failed to select a text. Plaintiff never resubmitted the course or any other for approval.

Dr. Yeargan further testified that Plaintiff was wholly ineffective in revamping the lab and never availed himself of equipment available to him for over a year.

Dr. Yeargan was of the opinion that Plaintiff's Training, Retention, Minority Engineering program should not count as creative research because although Plaintiff obtained funding, he never published anything connected therewith.

It is apparent to the Court that even if Plaintiff's minority work was to be regarded as creative research, the University had ample grounds, in light of the above, to set Plaintiff's salary increases in the manner and amount in which they were awarded.

Plaintiff made the point at trial that use of the publication factor with respect to evaluation may be a discriminatory system. Although the Court is convinced that such a factor is "validated" in that research in the area of perhaps the most quickly developing area of science today is crucial in order to remain abreast of the state of the art, the Court notes that the argument itself assumes that minorities cannot and do not perform scholarly research of the same publishable quality as whites, an assumption the Court does not accept.

Dr. Gordon Morgan, a black faculty member and a full professor, testified that he felt blacks could not get as much research money as whites, although he could only speak of his own experiences in this regard. Dr. Morgan admitted, however, that he normally by-passed the regular channels in seeking funds and that this could account for his relative lack of receipt of funds. Dr. Morgan was disgruntled about his advancement at the University because, as a full professor, he could only move up to a Dean.

Nonetheless, it is Plaintiff's advancement with which we are concerned and that advancement was especially accelerated at the outset for Plaintiff.

In any event Plaintiff has failed to present a *prima facie* showing of discriminatory *animus* in regard to his salary increases and the University has articulated legitimate, non-discriminatory reasons for their action which the Plaintiff has failed to demonstrate are merely pretextual. Accordingly, Plaintiff's proof falls short as to the salary increases.

### C. *Harassment*

█ Plaintiff argues that Plaintiff was treated differently from the date of his arrival on campus by the Electrical Engineering faculty. Dr. Waite testified that any hostility which existed initially diminished over time.

As examples, Plaintiff presented evidence that he was referred to by his last name rather than "Doctor"; that whites didn't knock on his door; that he was placed on numerous committees for the "tokenistic" purpose of increasing black representation; and that his secretaries did not like him.

As further evidence of intentional discrimination Plaintiff offered evidence tending to show that the supervisory and administrative super-structure of the University is "lily-white"; that blacks are underrepresented on the faculty; that Dr. Halligan admitted making race-conscious decisions, even though they benefited Plaintiff; and that the racial atmosphere at the University was not good.

However, Plaintiff himself testified that although he resented serving on so many committees because it took time from his other activities, he didn't feel as though there was any discriminatory intent in placing him on the committees and that the intention, he believed, was to *increase* minority representation. The other incidents of "harassment" seem to be isolated occasions not necessarily motivated by a dis-

criminatory *animus*. What Plaintiff seems not to realize is that it is a trait of human nature that some people instinctively resent a situation wherein a person "from the outside" is brought in, given a full associate professorship, moved "ahead" of several faculty members already employed at the University, and given an unusual twelve-month contract rather than the usual nine-month contract, regardless of the race of the person involved. The fact that Plaintiff was hired in an effort to comply with the now-styled *Adams, et al. v. Bell*, 3095–70 (D.D.C.1983) desegregation orders, i.e. partially because of his race, rather than in a purely racially neutral manner, merely exacerbated the resentment. Naturally such resentment if it exists at all, is not to be encouraged, however it is something no court or legislature in this Country can remove with the stroke of an impassioned pen or grandiose oration. Personality conflicts and personal animosity are beyond the power of this Court to remedy. The only questions before this Court are whether Plaintiff, as a member of a protected class was adversely affected by actions of Defendants or was treated in a manner different from members of the majority; if so, whether Defendants have articulated legitimate, non-discriminatory reasons for the actions taken; if so, whether Plaintiff can show that those reasons are merely pretextual.

Plaintiff has failed to demonstrate the existence of a pattern of harassment. The *ad hoc* Committee likewise found no evidence of harassment, but rather an "attitude problem". Those isolated incidents of which Plaintiff complains are merely the result of personal attitudes and resentment because of the circumstances surrounding Plaintiff's introduction to the faculty rather than any racial motivation. There is no pretextual "cover-up" of discrimination with respect to Plaintiff's claims.

The Court finds that if Plaintiff were white rather than black he would have been treated no differently in the area of salary, contract terms, or harassment than he was in the instant case, except that since Plaintiff was hired partially in an effort to comply with desegregation orders and to work with minorities, he may not have been hired initially had he been white.

Plaintiff has presented much evidence concerning the poor "track record" of the University in the area of desegregation and minority affairs. See *Adams v. Richardson*, 351 F.Supp. 636 (D.D.C.1973). It is true that despite repeated court orders, segregation has not been eradicated at the University of Arkansas, nor the country at large. Plaintiff inelegantly terms this the University's "bigoted history".

Bigoted as its history may be, it is not the history of the University that is at issue here, it is whether the *Plaintiff*, during his employment at the University, was the object of discrimination by official actions, policies, or conduct on behalf of the University. The Court, quite frankly, does not believe that is the case.

### III. *Conclusions of Law*

■ In order to prevail on a charge of discrimination in employment based upon race, the Plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination by showing that he (1) belongs to a protected minority group; (2) that he was qualified for or deserving of the employment benefit sought; (3) that he did not receive the benefit sought despite his qualifications and satisfactory job performance; and (4) that the benefit was given to another person of no greater qualifications. *Texas Dept. of Commun. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Plaintiff has proved that he is black and that he did not receive the employment benefits sought. However, the Court concludes that Plaintiff has failed to demonstrate that he was deserving of a perpetual twelve-month contract, as opposed to a nine-month contract, and has failed to show that he was entitled to raises in amounts greater than those received. Further, although Plaintiff's salary increases were not

as great as those of the majority of the department, Plaintiff has failed to show that other persons were extended a twelve-month contract in his stead. Likewise, Plaintiff has failed to demonstrate that he was disadvantaged by the reduction of his contract to one of nine months. Thus, we conclude that Plaintiff has failed to establish a *prima facie* case of discrimination.

However, even if the facts adduced at trial should have raised an inference of discrimination, the University had articulated legitimate, nondiscriminatory reasons for the treatment, if any, of Plaintiff. In this respect, even had Plaintiff presented a *prima facie* case, the University has rebutted the presumption of discriminatory intent which would have arisen therefrom. *Burdine, supra.* The reasons articulated for the contract reduction were that "soft" funding from private sources, previously donated specifically for the purpose, had declined; that the University therefore no longer wished to extend preferential treatment to Plaintiff; and that the University could offer Plaintiff substantially the same package on an *ad hoc* basis by use of the usual nine-month contract and additional summer contracts.

The reasons articulated for the amounts of Plaintiff's salary increases are that Plaintiff has consistently failed to engage in scholarly research, his failure to develop and teach new courses, the numerous student complaints received, his failure to develop and pursue contacts and leads made at Prairie View A and M, the subjective evaluations that Plaintiff has had no significant input into the engineering program, Plaintiff's unscheduled absences, Plaintiff's poor testing procedures, Plaintiff's ineffectiveness in "revamping" the lab, and Plaintiff's non-use of equipment available to him.

Even if research were not *required* by the University, scholarly research *voluntarily* undertaken could, in the Court's view, be a valid factor in considering the amount of salary increases. Further, even if Plaintiff's minority work were counted as scholarly research, the University nonetheless may validly evaluate Plaintiff's teaching ability, lab management, and overall contribution to the department in formulating the amount of Plaintiff's salary increases.

The Court agrees with Plaintiff that where direct evidence of discriminatory *animus* is shown there is no need to apply the *McDonnell* test. *Lee v. Russell Cty. Bd. of Education,* 684 F.2d 769 (11th Cir.1982). The Court, however, is unable to conclude from any fair reading of the evidence that Plaintiff has proven *directly* the existence of discriminatory intent directed at him. Accordingly, the Court believes the proper test to be the one articulated in *McDonnell.*

Having concluded that even if Plaintiff had demonstrated a *prima facie* case of discrimination the University has sufficiently rebutted the same, the burden now falls upon the Plaintiff to demonstrate that the reasons offered by the Defendants were pretextual, *i.e.,* that the true reason for the "reduction" of Plaintiff's contract to nine months and the amount of his salary increases was racial in nature. The Court does not find Plaintiff's race to have been the motivating factor in his contractual modification or salary. Hence, he has not met his burden of proof.

With respect to Plaintiff's harassment claim, it is clear that Plaintiff must demonstrate the existence of a discriminatory and offensive work environment so heavily polluted with discrimination as to seriously adversely affect the emotional and psychological stability of minority employees. *See Taylor v. Jones,* 653 F.2d 1193 (8th Cir.1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87 (8th Cir. 1977). The incidents of which Plaintiff complains were not so pervasive and so long-continuing in the department that the University must be deemed to have knowingly tolerated it. The evidence supports a finding that Plaintiff may have been resented because of his initially preferential or accelerated advancement, but such incidents were isolated and unrelated manifestations of minor animosity not grounded in race.

A judgment will be concurrently entered in favor of Defendants.