**Dr. James A. ROLLINS and Dr. Nanette P. Rollins, Plaintiffs,**

**v.**

**Dr. Jefferson C. FARRIS, Individually and His Official Capacity as President of UCA; Mrs. Charles Hammans, Jr., Chairman and Dr. John W. Sneed, Jr., Ben Burton; James Ahlf, Dr. Albert Johnson, Judge Henry Jones and Joe White, Members of the Board of Trustees of UCA, Individually and Their Official Capacities, Defendants.**

**No. LR–C–85–139.**

United States District Court, E.D. Arkansas, W.D.

Dec. 19, 1985.

Nelwyn Davis, Little Rock, Ark., for plaintiffs.

James D. Gingerich, University Counsel, Conway, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiffs initiated this action on February 22, 1985, asserting claims based upon 42 U.S.C. §§ 1983 and 2000e and 29 U.S.C. § 626(b). Specifically it is alleged that Dr. Nanette Rollins was hired by the University of Central Arkansas as an assistant professor on July 12, 1978. She became eligible for tenure in January, 1984. She timely applied for tenure and was denied on July 3, 1984. The position was subsequently declared "available."

Plaintiffs contend that the denial of tenure constitutes unlawful age discrimination, reverse sex discrimination, and a denial of due process. The denial of tenure was allegedly based partially upon false rumors upon which the tenure committee relied. No reason for the denial of tenure was stated at the time.

Dr. Nanette Rollins filed timely charges of sex, race and age discrimination with the EEOC, and all jurisdictional prerequisites for the filing of the claims in this court have been met.

Dr. James Rollins alleges that his summer teaching schedule was eliminated and his fall schedule was severely reduced in retaliation for certain statements allegedly made by him. He contends that the actions and conduct by UCA constitute unlawful retaliatory discrimination under section 2000e and the First Amendment. Timely charges were filed with the EEOC and a "right to sue" letter was issued in June, 1985.

Plaintiffs seek a mandatory injunction directing the appropriate defendants to grant Dr. Nanette Rollins tenure, declaratory relief, an injunction from further violations, reinstatement of Dr. James Rollins' summer teaching position, monetary relief, and costs and attorney's fees.

The case is currently before the court pursuant to plaintiffs' motion to compel certain discovery filed August 13, 1985. In this motion it is alleged that Sarah McAuley, a member of the tenure committee, refused to answer certain questions propounded during a deposition. The questions concerned what specific areas of Dr. Nanette Rollins' application for tenure provoked negative comments by the committee. In refusing to answer, Sarah McAuley invoked "academic freedom" or privileged committee communications. Ms. McAuley, during the deposition, referred to minutes of the tenure committee as the precipitating cause of the discussion. Plaintiffs allege that the defendants failed to produce those minutes as requested in certain interrogatories.

Ms. McAuley had testified that two persons considered for tenure prior to Dr. Nanette Rollins were routinely approved after consideration of their applications and specific criteria listed in the "handbook." Ms. McAuley indicated that, with regard to Dr. Nanette Rollins, matters not contained in the handbook and application were considered. She indicated further that the other matters were raised by the minutes of the department meeting.

Plaintiffs seek to discover tenure files for various faculty members and minutes of the faculty committees which considered Dr. Nanette Rollins' application.

The defendants' position is that these matters are privileged because of "academic freedom," and cannot be compelled to be disclosed without "some independent evidence of discrimination on the part of the university or evidence that Dr. Nanette Rollins' qualifications were clearly superior."

It is well-settled that in order to establish a prima facie case under 42 U.S.C. § 2000e or 29 U.S.C. § 626, the plaintiff must show that she was qualified for the position, that she was rejected and that a member of a non-protected class was chosen. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Tolliver v. Yeargan*, 567 F.Supp. 116 (W.D.Ark.1983), *aff'd*, 728 F.2d 1076 (8th Cir.1984). If the plaintiffs establish a

prima facie case, the burden shifts to the defendants to articulate legitimate, non-discriminatory reasons for the action taken. If the defendants meet this burden, plaintiffs may then demonstrate that the given reasons are merely pretextual. *Burdine, supra.*

Rule 26(b)(1) states, *inter alia:* "... Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...."

Because it cannot be disputed that the requested materials are "relevant," inasmuch as they would tend to disclose the matters considered by the university and the "true" reasons for the actions of the defendants, it is obvious that the materials are discoverable under the language of the rule unless privileged.

Defendants argue that this court should adopt a qualified academic peer review privilege, which would prevent disclosure of confidential peer review material absent a showing of an inference of discrimination, in order to "balance" the needs of the employee and the university's "academic freedom" interest. It cannot be disputed that faculty employment decisions comprehend discretionary academic determinations which entail review of the intellectual work product of tenure candidates. That decision is most effectively made within the university. "The peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Johnson v. Univ. of Pittsburgh,* 435 F.Supp. 1328 (W.D.Pa.1977). The importance of confidentiality to decision-making processes is recognized throughout the American educational processes.

It is urged, however, that if an academic freedom privilege could be used to totally prohibit disclosure of tenure review records, the privilege could be used as a shield to hide evidence of discrimination. In such a case, the integrity of the truth-seeking process would be impaired and the legislative goal of eradicating discrimination would be impaired.

This issue has been addressed by at least four circuits, with differing results. In *EEOC v. Univ. of Notre Dame du Lac,* 715 F.2d 331 (7th Cir.1983), the Court of Appeals for the Seventh Circuit recognized a "qualified" privilege which requires a showing of "particularized need" before a court may order disclosure of the names and identities of persons responsible for material generated in the peer review tenure process. However, the court directed that the following procedure be employed:

... Before producing the personnel files sought by the EEOC, the University should be permitted to redact the name, address, institutional affiliation, and any other identifying features ... of the reporting scholar from the evaluations found in each of the files. After completing the redaction procedures outlined above, the University should ... produce the redacted files and in addition, the original unredacted files to the district court. The district court shall then review the files, *in camera,* to determine whether the redactions are reasonably necessary to prevent disclosure of the identity of the scholar or scholars providing the evaluation. Should the court determine that the redactions are reasonably necessary to prevent disclosure of the identity of the evaluating scholar, then the redacted files should be turned over to the EEOC and the unredacted files returned to the University.

If, after receiving the redacted files, the EEOC believes that it is necessary to seek more information from the unredacted files, the EEOC must then make a particularized showing before the court as to its need for further disclosure....

The Seventh Circuit thus recognized "a qualified academic freedom privilege protecting academic institutions against the disclosure of the names and identities of persons participating in the peer review process...." The court required only that there be "substance" to the requesting party's claim and that thorough discovery be conducted prior to the request for redacted

files. *See Univ. of Notre Dame du Lac* at 337 n. 4.

The Seventh Circuit relied in part on *Gray v. Board of Higher Education,* 692 F.2d 901 (2d Cir.1982). The Second Circuit in *Gray* adopted a balancing approach but not a rule of privilege:

Any finding that information is protected from discovery must reflect a balancing between, on the one hand, the parties' right to discovery, which stems from society's intent in a full and fair adjudication of the issues involved in litigation and, on the other hand, the existence of a societal interest in protecting the confidentiality of certain disclosures made within the context of certain relationships of acknowledged social value.

*Gray* at 903.

The Second Circuit struck the balance in favor of the plaintiff:

[E]xamination of the elements of Gray's case, however, makes Gray's need for the votes transparently evident. Were this a Title VII suit ... our task would be somewhat simpler in the light of the holdings in *Lieberman v. Gant,* 630 F.2d 60 (2d Cir.1980), and *Guardians Ass'n of New York City P.D., Inc. v. Civil Service Comm'n,* 633 F.2d 232 (2d Cir.1980), that direct proof of discriminatory intent is not necessary. But the Supreme Court has now decided that a finding of intent is necessary in suits like this one under 42 U.S.C. § 1981, *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania* [458 U.S. 375], 102 S.Ct. 3141 [73 L.Ed.2d 835] (1982), and thereby resolved the conflict of authority in the circuits on the point, upholding our circuit's decision that discriminatory impact alone is insufficient proof under § 1981. Moreover, to establish his Fourteenth Amendment claim that his civil rights were denied, Dr. Gray must show that the discrimination he suffered was intentional (citations omitted).

*Gray* at 905.

... [I]f unable to engage in discovery, Dr. Gray cannot prove intent, and without proof of intent he has no case. In

certifying the interlocutory appeal, Judge Haight ... found that the votes of the Committee members were an indispensable element of Dr. Gray's case without which proof of an intent to discriminate could be impossible.

*Gray* at 906.

Thus, the Second Circuit concluded that the votes and discussions of the tenure committee could be discovered in an action arising under 42 U.S.C. §§ 1981, 1983 and 1985. To hold otherwise would be to force plaintiffs "to chase an invisible quarry" because without at least knowing the votes, a plaintiff can hardly be said to have a "full and fair opportunity" to demonstrate employment discrimination. *See Gray* at 906.

Upon considering this issue, the Fifth Circuit expressly rejected a proposed privilege based on academic freedom in *In re Dinnan,* 661 F.2d 426 (5th Cir.1981). In *Dinnan,* the Fifth Circuit said:

Since neither academic freedom nor any valid secret ballot consideration is raised in the instant case, the truth-seeking function of our system of justice must prevail over the novel privilege claimed by the appellant.

*Dinnan* at 428.

Thus, the Fifth Circuit held that there existed no privilege which would enable a professor to withhold information in response to a deposition question in an employment discrimination suit regarding his vote on a plaintiff's employment status. The court explained:

Persons occupying positions of responsibility, like Dinnan, often must make difficult decisions. The consequences of such responsibility is that occasionally the decision-maker will be called upon to explain his actions. In such a case, he must have the courage to stand up and publicly account for his decision. If that means that a few weak-willed individuals will be deterred from serving in positions of public trust, so be it; society is better off without their services. If the deci-

sion-maker has acted for legitimate reasons, he has nothing to fear.

*Dinnan* at 432.

The court in *Dinnan* explained:

Using the appellant's logic, if a tenure committee attempted to stop the promotion of all faculty members who were not pro-abortionists, a right-to-life music professor's attempt at discovery could be barred by the concept of "academic freedom." Likewise, a physicist's application might be sabotaged because he opposed the cession of the Panama Canal where such a position was not favored by the committee. In all these cases, "academic freedom" would shield the tenure committee from having to reveal its votes, even though the decision had nothing to do with academic grounds. In every one of these scenarios, the rights of the applicant would be infringed upon, but "academic freedom" would serve to obstruct the vindication of these rights. This possibility is a much greater threat to our liberty and academic freedom than the compulsion of discovery in the instant case.

Reviewing the precedents, the Third Circuit has, too, rejected the conclusions of the Second and Seventh Circuits, instead flatly stating that neither a balancing approach nor a qualified academic privilege should be adopted. *EEOC v. Franklin and Marshall College,* 775 F.2d 110 (3rd Cir.1985).

In *Franklin,* the Third Circuit reviewed its prior decision in *Kunda v. Muhlenberg College,* 621 F.2d 532 (3rd Cir.1980), which concluded from the legislative history of Title VII that, notwithstanding principles of academic freedom, tenure decisions fall within the intended scope of the Act. According to the Third Circuit, no inference can be drawn from the legislative history that Congress intended or would permit academic institutions to bar access to material relevant to a charge of unlawful employment discrimination. The court noted that permitting disclosure of confidential peer review material may burden the peer review process, but concluded that in view

of the clear mandate of Congress, which identified and recognized the threat of unchecked discrimination in education, the court had no choice but to trust that the personal integrity of the reviewers in evaluation decisions will overcome feelings of discomfort, and will outlast the demise of absolute confidentiality.

Thus, the Third and Fifth Circuits have expressly rejected the contention that a plaintiff must show anything more than relevance as defined in the discovery rules in order to discover votes or deliberations on employment decisions by colleges and universities in appropriate litigation. The Second Circuit's balancing approach also requires disclosure in any case where such evidence is essential to proof of an element of a plaintiff's case. *See Gray* at 906.

The Seventh Circuit stands alone in recognizing a "privilege" which requires "a substantial showing of 'particularized need'" for the information before disclosure will be ordered. *See Univ. of Notre Dame du Lac* at 338. However, even this view requires that redacted files be produced to the plaintiff upon a showing of "substance" and thorough discovery and unredacted files to the court for *in camera* review. A "particularized need" is only required by the Seventh Circuit prior to the ordered disclosure of unredacted files or materials.

■ In resolving the tensions between the opposed needs of disclosure and confidentiality it must be remembered that the discovery rules are to be accorded broad and liberal treatment, particularly where proof of intent is required. *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). The court does not believe that the assertion of a marginal infringement on the processes of peer selection can be sufficient to dispose of the rights of the plaintiffs to establish the elements of a claim of unlawful discrimination. In the context of peer selection academic freedom cannot be paramount to all

other rights, particularly where the asserted "freedom" is a freedom to secrete relevant information rather than to convey ideas. As the Second Circuit said in *Gray:*

> [A]cademic freedom is illusory when it does not protect faculty from censorious practices but rather serves as a veil for those who might act as censors. Because our decision today inhibits capricious nonrenewal of employment based on race rather than academic grounds, we believe it to be basically consistent with the goals of academic freedom

*Gray* at 909.

Privileges are based on the concept that certain societal values are more important than the ascertainment of truth. The Supreme Court has said that "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).

■ The court has carefully reviewed the parties' arguments and counter-arguments, and without belaboring the same, concludes that the votes, minutes and deliberations of the tenure reviewing body may be discovered in employment discrimination actions in which proof of intent to discriminate is necessary to establish an element of the claim or to rebut proof offered by the defendant.

■ This does not mean that plaintiffs may obtain *carte blanche* authority to discover secret discussions merely by alleging an employment discrimination. Such confidential deliberations would be discoverable if a plaintiff alleges that the tenure committee harbors a discriminatory animus against him and that this animus would be reflected in notes of the deliberations or votes taken. Similarly, if a defendant claims that the tenure denial was based on evaluations of a plaintiff's performance discussed at the tenure committee meetings, then certainly a plaintiff will be hamstrung

if denied disclosure. There may be cases, however, where disclosure is unwarranted. If, for example, a faculty member is falsely accused of tardiness, missed classes, or drunkenness on the job, these allegations could possibly be shown to be pretextual in nature without reference to the confidential deliberations.

■ In the instant case, however, it is the information contained in the minutes of the tenure committee meeting that formed the basis of the action taken. It is alleged that matters other than the criteria listed in the handbook were discriminatorily considered by the committee. Plaintiffs are entitled to know what matters were considered and are entitled to ascertain the reasons for the action taken in order to prove their case. If there is nothing beneficial to the plaintiffs to be found, the tenure committee will be publicly vindicated. If there is, on the other hand, information damaging to the university's position to be found in the minutes, that fact amply demonstrates why such information should be discoverable.

Academic freedom in employment actions extends only insofar as legitimate, academic grounds form the basis of tenure decisions. Justice Frankfurter's oft-quoted statement of "the four essential freedoms" of a university—"to determine for itself *on academic grounds* who may teach, what may be taught, how it shall be taught, and who may be admitted to study," *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (emphasis added)—makes this clear.

It has been recognized that courts should intervene in tenure decisions by the professionals where there are allegations of discriminatory treatment in the confidential deliberations:

> Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as a mechanism to obscure

**720**

discrimination, they must be left for evaluation by the professionals. . . .

*Kunda* at 547–48.

As the court said in *Dinnan:* "Here the allegation is that the appellee was *discriminated against,* precisely the situation that the Third Circuit envisioned in *Kunda v. Muhlenberg College* in which courts should intervene." *Dinnan* at 431 (emphasis in original).

The court concludes that the degree of infringement on the processes of peer selection "is outweighed both by the demands of fair employment as well as those of academic excellence and freedom." *Gray* at 908. The court specifically declines to adopt the position of the Seventh Circuit advanced in *Univ. of Notre Dame du Lac,* and finds that the requested materials are discoverable under the holdings of the Second Circuit in *Gray,* the Fifth Circuit in *Dinnan,* and the Third Circuit in *Franklin and Marshall College.* Because the interests of academic freedom in peer review decisions, when balanced against the constitutional and statutory rights of tenure applicants to be free from unlawful discrimination, are adequately protected by the scope of the rules of discovery, this court adopts the holding of the Third Circuit in *Franklin and Marshall College,* although, as noted, the requested materials would be discoverable under the tests of all circuits to have reached this issue, other than that of the Seventh Circuit.

In accordance with the above and foregoing, the court concludes that plaintiffs' motion to compel should be granted. A separate order to this effect will be concurrently entered.