**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Appellee,**

**v.**

**FRANKLIN AND MARSHALL COLLEGE, Appellant.**

**No. 84–1739.**

United States Court of Appeals, Third Circuit.

Argued Aug. 5, 1985.

Decided Oct. 21, 1985.

Rehearing and Rehearing En Banc Denied Nov. 29, 1985.

Johnny J. Butler, Acting General Counsel, Vella M. Fink, Asst. General Counsel, Colleen M. O'Connor (argued), J. Kenneth L. Morse, Attys., E.E.O.C., Washington, D.C., for appellee.

George C. Werner, Jr. (argued), Barley, Snyder, Cooper & Barber, Lancaster, Pa., for appellant.

Rod J. Pera, Mary Jane Forbes, J. Thomas Menaker, McNees, Wallace & Nurick, Harrisburg, Pa., for amici curiae.

Before ALDISERT, Chief Judge, and STAPLETON and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

This court must decide whether the district court erred in requiring Franklin and Marshall College ("College") to comply with a subpoena duces tecum issued by the Equal Employment Opportunity Commission ("EEOC") which compels disclosure of confidential peer review material. The College and the *amici curiae* urge adoption of a qualified academic peer review privilege which, if properly applied to the facts at issue, would protect, they argue, the confidential material from the agency's subpoena. After careful consideration of all matters raised by brief and in oral arguments, we decline to adopt the proffered qualified academic peer review privilege. Because we find that the material sought by the EEOC is relevant to its investigation, the order compelling compliance with the subpoena will be affirmed.

### I.

This subpoena enforcement action arises out of the EEOC's investigation of a charge of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17, filed by Gerard Montbertrand, a former assistant professor who was denied tenure, against the College. Professor Montbertrand was hired on July 1, 1977 as a member of the College's French Department. He was assigned primarily upper level French courses, although the College asserts that, due to the Department's limited size (4 professors), he was expected to be able to teach lower level French language courses. In the Fall of 1980, Professor Montbertrand was reviewed for tenure by the Professional Standards Committee. The committee is composed of the Dean of the College and five faculty-elected members. It performs all tenure reviews at the College. The Chairperson of the French and Italian Departments did inform the committee of evaluations recommending Professor Montbertrand for tenure. The Professional Standards Committee, however, recommended against awarding tenure to Montbertrand. That recommendation was accepted by the Dean and by the President of the College.

After Professor Montbertrand was informed of the denial of his tenure, he requested a written statement of the reasons.

In a letter from the President of the College dated January 21, 1981, Montbertrand was informed that the minutes of the Professional Standards Committee stated that "[t]enure was not recommended because deficiencies in the areas of scholarship and general contributions were not sufficiently offset by performance in other areas." Appendix, at 101a.

Professor Montbertrand requested reconsideration of the tenure decision. The Professional Standards Committee reconsidered its decision in light of additional information submitted by Montbertrand and by others. The committee reaffirmed its earlier recommendation to deny tenure. That recommendation was again accepted by the Dean and by the President of the College.

Professor Montbertrand petitioned the College's Grievance Committee for review of the tenure decision, alleging denial of academic freedom and academic due process. After reviewing the allegations and finding no merit in the claims, the Grievance Committee dismissed the petition in May of 1981.

In June of 1981, Professor Montbertrand filed a charge of discrimination with the EEOC alleging discrimination based on his French national origin. In the course of its investigation, the EEOC issued the subpoena duces tecum which is the subject of this action. The subpoena required that the College:

1. For each individual *granted* or *denied* tenure during the period November 7, 1977 to the present, provide the following records or documents:

   a) Tenure Recommendation forms,

   b) COTE form results [analyzing student evaluations],

   c) Grade surveys,

   d) Enrollment data,

   e) Annual evaluation forms, including third year review,

   f) Governance evaluation forms,

   g) Publication information and evaluations by outside experts,

   h) Letters of reference,

i) Information regarding academic advising,

j) All notes, letters, memoranda or other documents considered during each tenure case, including curricula vitae,

k) Recommendations of Professional Standards Committee in each tenure case, and

l) Actions taken by the President in each tenure case.

2. Produce and make available for inspection all notes, letters, memoranda or other documents generated by each Professional Standards Committee member, as part of his/her involvement in Charging Party's original tenure case and subsequent reconsideration.

3. Produce and make available for inspection the minutes of each Professional Standards Committee meeting in which each tenure case, during the period November 1977 to the present, was discussed.

Appendix, at 32a–33a. The EEOC offered to accept the material with names and identifying characteristics deleted. *Id.* at 129a.

Prior to the issuance of the subpoena, the College had permitted the EEOC to review, but not copy, the minutes of all Professional Standards Committee meetings regarding the Montbertrand decision. In response to the subpoena, the College agreed to provide the EEOC with data regarding the performance of each tenure candidate considered from 1977 to the date of the subpoena as well as the disposition of each case and the statement of reasons from the Professional Standards Committee (subpoena requests 1(k) & 1(*l*)). The College also offered to comply with the portions of the subpoena seeking documents not considered confidential peer review material such as COTE scores, grade surveys and enrollment data (subpoena requests 1(b), 1(c) & 1(d)).

At issue before us now is the College's refusal to provide the bulk of the material sought, including tenure recommendation forms prepared by faculty members, annual evaluations (except those prepared by

the Dean), letters of reference, evaluations of publications by outside experts, and all notes, letters, memoranda or other documents considered during each tenure decision (subpoena requests 1(a), 1(e), 1(g), 1(h), 1(j), 2 & 3).[1]

When the EEOC pressed for full compliance with the subpoena, the College pursued administrative relief by filing with the agency a Petition to Revoke or Modify the Subpoena. After the EEOC denied the petition on August 18, 1983, the College appealed to the EEOC to alter its decision. The EEOC denied that appeal on June 29, 1984. The College informed the EEOC on July 26, 1984 that it would not fully comply with the subpoena.

The EEOC then initiated the instant litigation by filing an Application for Order to Show Cause Why a Subpoena Should Not Be Enforced in the district court. On November 9, 1984, the court filed an Order compelling the College to comply with subpoena requests 1(e), 1(h), 1(j), 2 and 3 but, with the EEOC's concurrence, allowing the College to omit names and identifying data.

The College subsequently filed this appeal and moved the district court for a stay pending appeal. On December 28, 1984, the district court filed an order staying enforcement of its order compelling compliance with the subpoena pending disposition of the appeal. We granted Gettysburg College and Dickinson College leave to file an *amici curiae* brief. We also permitted Allegheny College, Bucknell University, Chatham College, Haverford College, Lafayette College and Lehigh University to participate as *amici curiae* and to adopt the *amici curiae* brief previously filed.

## II.

On appeal, the appellant and the *amici curiae* urge this court to reverse the district court's order compelling the College's compliance with the subpoena duces tecum issued by the appellee. The appellant contends that "the quality of a college, and in a broader sense, academic freedom, which

has a constitutional dimension, is inextricably intertwined with a confidential peer review process." Brief of Appellant, at 116. For this reason, the appellant argues, "disclosure of peer review material should be compelled only when facts and circumstances give rise to a sufficient inference that some impermissible consideration played a role in the tenure decision." *Id.* at 116. The appellant suggests that the court should adopt a qualified academic peer review privilege which would prevent disclosure of confidential peer review material absent a showing of an inference of discrimination. Adoption of such a privilege, argues the appellant, strikes the proper balance between the needs of the EEOC in its investigation and the College's interest in maintaining academic freedom.

The appellant and the *amici curiae* are not the first to advocate the privilege. Several United States Courts of Appeals have addressed the issue and have reached differing results. The United States Court of Appeals for the Seventh Circuit has recognized a qualified privilege requiring particularized need before ordering disclosure of the names and identities of persons responsible for material generated in the peer review tenure process. *EEOC v. University of Notre Dame Du Lac*, 715 F.2d 331, 337–38 (7th Cir.1983). The Court of Appeals noted the unusual posture of the case, stating that "[t]his case is unique in that Notre Dame is voluntarily producing redacted files to the EEOC." *Id.* at 337 n. 4. The court did suggest that in a case where disclosure of the confidential material was in controversy, "there must be substance to the charging party's claim and thorough discovery conducted before even redacted files are made available." *Id.*

The United States Court of Appeals for the Second Circuit adopted a balancing approach, but not a rule of privilege, in a discrimination action brought under 42 U.S.C. §§ 1981, 1983 & 1985. *Gray v. Board of Higher Education, City of New*

---

**1.** The College apparently does not possess governance evaluation forms and information regarding academic advising (subpoena requests 1(f) & 1(i)). *See* Appendix, at 62a.

*York,* 692 F.2d 901, 904–05 (2d Cir.1982). The Court of Appeals applied its balancing test and decided, on the particular facts of the case, to reverse the district court's order denying the plaintiffs' motion to compel discovery of the votes of two members of the tenure committee. While the case did not involve a subpoena issued by the EEOC pursuant to Title VII, the analysis of the *Gray* court may be helpful nonetheless in the context of a Title VII investigation. *Cf. EEOC v. University of Notre Dame Du Lac,* 715 F.2d at 337 & n. 3.

Unlike the Seventh and Second Circuits, the United States Court of Appeals for the Fifth Circuit expressly rejected a proposed privilege based on academic freedom. *In re Dinnan,* 661 F.2d 426, 427 (5th Cir. 1981), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982). The *Dinnan* court held that a member of the College Education Promotion Review Committee could not refuse to reveal his vote on the application for promotion in question. *Id.*

■ We decline to follow the Seventh and Second Circuits in recognizing either a qualified academic privilege or in adopting a balancing approach. It is true that the concept of "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of the University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978) (Powell, J., announcing Court's judgment and expressing his views of case). " '[T]he four essential freedoms' of a university" have been said to include the freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result) (citation omitted). Central to the determination of "who may teach," or who will receive tenure, has been the system of peer review by confidential evaluations and recommendations of tenured faculty. "[T]he peer review system has evolved as the most reliable method for assuring promotion of the candidates best qualified to serve the needs of the institution." *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1346 (W.D.Pa.1977) (citation omitted) (quoted in *Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3d Cir.1980)).

We recognize that confidentiality in the peer review system plays an important role in obtaining candid, honest assessments of the candidates under review and, thus, has been essential to the determination of "who may teach," especially in such close educational settings of the size of appellant where tenure applicants and tenure decision-makers continue to work side-by-side. Appellant and *amici curiae* have forcefully argued the increased importance of confidentiality based upon the relatively small size of the teaching staffs and administrative personnel. They cite embarrassment, confrontational situations and the fear of less than honest evaluations as likely results of a lack of confidentiality.

In assessing the importance of the academic freedom principles at issue, our starting point is an examination of Congress' intent in enacting and amending Title VII legislation. We begin with Congress' manifest refusal to exempt academic institutions from Title VII's prohibition against discrimination. As the Supreme Court of the United States has reminded us, "Congress indicated that it considered the policy against discrimination to be of the 'highest priority.' " *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974) (citation omitted). Congress clearly intended that this goal be no less important in the academic setting than in industry. In 1972, Congress deleted the exemption for institutions of higher education which was contained in the original legislation. As this court has stated previously, "[t]he legislative history of Title VII is unmistakable as to the legislative intent to subject academic institutions to its requirements." *Kunda,* 621 F.2d at 550. The House Report from the Education and Labor Committee, reporting on several proposed amendments

including the elimination of the immunity under Title VII previously extended to academic institutions, states:

> There is nothing in the legislative background of Title VII, nor does any national policy suggest itself to support the exemption of these educational institution employees—primarily teachers—from Title VII coverage.... The committee feels that discrimination in educational institutions is especially critical. The committee can not imagine a more sensitive area than educational institutions where the Nation's youth are exposed to a multitude of ideas that will strongly influence their fu[t]ure development. To permit discrimination here would, more than in any other area, tend to promote misconceptions leading to future patterns of discrimination.

H.R.Rep. No. 92–238, 92nd Cong., 2nd Sess. 19–20, *reprinted in* 1972 U.S.Code Cong. & Ad.News 2137, 2155. In *Kunda v. Muhlenberg College,* this court concluded from the legislative history of Title VII and its amendments that, notwithstanding principles of academic freedom, tenure decisions fall within the intended scope of the Act. 621 F.2d 532, 547–48 (3d Cir.1980). "Congress must have recognized that in order to achieve its legislative goals, courts would be forced to examine critically university employment decisions." *Davis v. Weidner,* 596 F.2d 726, 731 (7th Cir.1979).

We look further for evidence that Congress intended that special treatment be accorded academic institutions *under investigation* for discrimination and find none. No inference can be drawn from the legislative history of Title VII, as amended, that Congress intended or would permit academic institutions to bar the EEOC's access to material relevant to an investigation. A privilege or Second Circuit balancing approach which permits colleges and universities to avoid a thorough investigation would allow the institutions to hide evidence of discrimination behind a wall of secrecy.

We are not unmindful of nor insensitive to the importance of confidentiality in the peer review process, especially for institutions of the size and character of the appellant college and the *amici curiae.* We recognize that permitting disclosure to the EEOC of confidential peer review material may perhaps burden the tenure review process in our nation's universities and colleges. In the face of the clear mandate from Congress which identified and recognized the threat of unchecked discrimination in education, however, we have no choice but to trust that the honesty and integrity of the tenured reviewers in evaluation decisions will overcome feelings of discomfort and embarrassment and will outlast the demise of absolute confidentiality.

### III.

Appellant and *amici* urge an interpretation of the discovery rules which would require an initial showing by the EEOC of some merit to the discrimination charge before disclosure of confidential material could be ordered. In this regard, appellant argues that, despite the preliminary stage of this matter (i.e., prior to any litigation having been filed), the EEOC should be held to a higher discovery standard than parties would be once litigation has commenced. Further, appellant implicitly argues that discovery should be limited to the pretext issue and that any evidence that its legitimate reason for tenure denial is pretext (though denied) can be drawn from the non-confidential material and summary charts which the College is willing to release to the EEOC.

We reject this concept because it is inconsistent with the language, history and purpose of Title VII and with Congress' grant of investigatory authority to the EEOC. Congress has made clear that the scope of the EEOC's subpoena power is limited by the standard of relevance. *See* 42 U.S.C. § 2000e–8(a). The EEOC is not limited, as the appellant appears to suggest, to that which might be relevant at trial. Rather, the EEOC is entitled to all that is relevant to the charge under investigation. *EEOC v. Shell Oil Co.,* 466 U.S.

54, ——, 104 S.Ct. 1621, 1628, 80 L.Ed.2d 41 (1984). In *EEOC v. Shell Oil Co.*, the Supreme Court of the United States rejected the proposition that a district court must find the charge of discrimination to be well-founded, verifiable, or based on reasonable suspicion before enforcing an EEOC subpoena. *EEOC v. Shell Oil Co.*, 466 U.S. at —— n. 26 & —— n. 33, 104 S.Ct. at 1632 n. 26 & 1635 n. 33. The Court explained:

> The district court has a responsibility to satisfy itself that the charge is valid and that the material requested is "relevant" to the charge [citation omitted] and more generally to assess any contentions by the employer that the demand for information is too indefinite or has been made for an illegitimate purpose. [citations omitted] However, any effort by the court to assess the likelihood that the Commission would be able to prove the claims made in the charge would be reversible error.

*Id.* at —— n. 26, 104 S.Ct. at 1632 n. 26.

█ The concept of relevancy is construed broadly when a charge is in the investigatory stage. *EEOC v. University of Pittsburgh*, 643 F.2d 983, 986 (3d Cir.), *cert. denied*, 454 U.S. 880, 102 S.Ct. 362, 70 L.Ed.2d 190 (1981). The Supreme Court of the United States, in discussing the application of the relevance standard to a Title VII subpoena, noted Congress' apparent endorsement of an interpretation of the relevance standard which affords the EEOC access "to virtually any material that might cast light on the allegations against the employer."

> Since the enactment of Title VII, courts have generously construed the term "relevant" and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer. In 1972, Congress undoubtedly was aware of the manner in which the courts were construing the concept of "relevance" and implicitly endorsed it by leaving intact the statutory definition of the Commission's investigative authority. On the other hand, Congress did not eliminate the relevance requirement, and we must be careful not to construe the regulation adopted by the EEOC governing what goes into a charge in a fashion that renders that requirement a nullity.

*EEOC v. Shell Oil Co.*, 466 U.S. at ——, 104 S.Ct. at 1630.

Clearly, an alleged perpetrator of discrimination cannot be allowed to pick and choose the evidence which may be necessary for an agency investigation. There may be evidence of discriminatory intent *and* of pretext in the confidential notes and memorandum which the appellant seeks to protect. Likewise, confidential material pertaining to other candidates for tenure in a similar time frame may demonstrate that persons with lesser qualifications were granted tenure or that some pattern of discrimination appears. *Accord Namenwirth v. Board of Regents of University of Wisconsin System*, 769 F.2d 1235, 1240–41 (7th Cir.1985) (comparative evidence may be appropriate to rebut employer's proffered, non-discriminatory explanation). Relative qualifications of those who teach in academic institutions are not amenable to objective comparison in charts. Instead, the peer review material itself must be investigated to determine whether the evaluations are based in discrimination and whether they are reflected in the tenure decision.[2]

---

**2.** Tenure decisions are not entitled to special treatment in Title VII actions merely because they are founded in part on subjective criteria, including the level of esteem in which a candidate is held by his colleagues and peers. Similar criteria must be considered in a Title VII review of any employment decision.

> The subjective esteem of colleagues and supervisors is often the key to any employment decision. Yet, especially in the blue-collar context, the courts have not hesitated to review with great suspicion subjective judg-

ments that adversely affect minorities.... Indeed, subjective esteem is more important in certain blue-collar contexts, where, for example, lives may depend on the employee's performance and good judgment.... And because all lawyers and judges are trained in academia, courts are better equipped to scrutinize academic decisionmaking than decisionmaking in the perhaps less familiar blue-collar context.

*Namenwirth*, 769 F.2d at 1244–45 (Swygert, J., dissenting) (citations omitted).

■ We hasten to add in this regard that it is neither for the EEOC nor for the courts to reevaluate a candidate's qualifications. *Kunda,* 621 F.2d at 547–48 (cited with approval in *Hishon v. King & Spalding,* —— U.S. ——, —— n. 4, 104 S.Ct. 2229, 2233 n. 4, 81 L.Ed.2d 59 (1984) (Powell, J., concurring)). The scope of the EEOC's role is to determine whether or not there is evidence to support a charge that an employment decision was based upon reasons protected by federal statute. The oft times difficult decision to promote or to grant tenure shall be left exclusively to this nation's colleges and universities so long as the decisions are not made, in part large or small, upon statutorily impermissible reasons.

### IV.

■ After careful review of the EEOC's subpoena requests with the appropriate relevance standard in mind, we find the EEOC's requests are relevant and not overbroad. The material pertaining to the Montbertrand tenure decision is clearly relevant to the investigation. The EEOC also asks for material on persons other than Montbertrand who were considered for tenure from November 7, 1977 to the date of the subpoena. Since Montbertrand was hired in 1977 and considered for tenure in 1980, the data requested on other candidates is part of an appropriate comparative base. We note parenthetically that the district court ordered, with the EEOC's concurrence, that names and identifying data of the other professors would be omitted.

Consequently, since we find that the material sought in the subpoena duces tecum at issue is relevant to the EEOC's investigation, the district court's order will be affirmed.

ALDISERT, Chief Judge, dissenting.

What divides this panel is a philosophical difference in two separate, but in this case, related, broad concepts: the extent to which an EEOC administrative subpoena may cast an immense discovery net that compromises privacy expectations of innocent third parties without the EEOC being put to the most meager burden of asserting a factual justificatory predicate for its actions; and the extent, if any, to which an employment discrimination claim based on professional tenure denial in a four person Department of French in a small liberal arts college differs from a discrimination claim against a multinational corporation such as Shell Oil Company.

The majority believe that there is absolutely no difference between what may be obtained by an EEOC administrative subpoena when a claim for lifetime tenure and position is implicated in the context of a small liberal arts college or when made in the context of a typical commercial employer. Notwithstanding the wealth of materials already furnished the EEOC by the college relating to Montbertrand's application for tenure, the majority would not place any burden whatsoever on the EEOC to show that it cannot intelligently evaluate the claim until it is in possession of case histories of every tenured position implicating confidential communications of innocent third parties. I reject both approaches because I abhor dogmatic application of the law. I reject slot machine justice, what Roscoe Pound called "Mechanical Jurisprudence,"[1] because it has been my experience that in many cases everybody may be a bit right, that nobody is completely right or completely wrong, and that each case has its own pathology. Thus, automatic and unbridled EEOC subpoena searches cannot be the law; and if it is, I am reminded of Chamfort's aphorism: "It is easier to make certain things legal than to make them legitimate."

The claimant contends that he was discriminated against because he was a French native. The EEOC has been given virtually everything contained in claimant's personnel files. It seems to me that the administrative subpoena should not be en-

---

1. Pound, *Mechanical Jurisprudence,* 8 Colum.L.     Rev. 605 (1908).

forced in its entirety unless the EEOC demonstrates compelling necessity for rooting through confidential files of other faculty members. Certainly, the doctrine of *res inter alios acta* is alive and kicking today, and I believe that before a federal agency should be allowed to poke through the confidential files of strangers to an employment discrimination claim, it should be held to some justificatory burden before a federal judge, rather than being anointed with a ukase to fish in any waters selected by it, and it alone.

We have federal courts to draw the line against arbitrary and capricious federal agency actions and this case cries out for preliminary judicial adjudication, instead of agency action gone wild. The facts presented here require that a district court exercise a highly refined discretion and be particularly sensitive to the valid interest of confidentiality in the tenure review process before ordering wholesale production of confidential documents of strangers to this proceeding at this very preliminary stage of an investigation. Because neither the district court nor the majority accord this sensitivity, I dissent. I would reverse the judgment of the district court.

## I.

Several facts underlying this appeal are critical. Appellant Franklin and Marshall is a small liberal arts college with a student enrollment of 1,900. Montbertrand sought a tenured position in a French Department that consists of four persons. As is the norm in institutions of higher education, the decisional process in awarding tenure involves not only the college administrative staff, but faculty as well. Initial tenure decisions are made by the Professional Standards Committee, all five members of which are elected by the faculty. This committee makes tenure recommendations to the Dean and President of the College. In Montbertrand's case, the committee—comprised of faculty members only—recommended that Montbertrand be denied tenure because of his deficiencies in scholarship and in participation in college governance activities. The College administration adopted this recommendation and the administrative and judicial proceedings leading to this appeal followed.

The majority assert that the College has refused to produce "the bulk of the material sought" by the EEOC. Maj. op. typescript at 112. This characterization is not fair. The College has provided or agreed to provide a considerable amount of data.[2] I believe the district court should have analyzed this data carefully and on the basis of such analysis, required the EEOC to show that it had established a sufficient factual

---

2. This material includes:
1. Materials from Montbertrand's tenure file including:
(a) Third and Second Year Reviews;
(b) Letters to Montbertrand on the status of his tenure review; and
(c) Documents of Montbertrand supporting his tenure application;
2. Compilation by the College of the national origin of tenure candidates from 1977 to 1981;
3. Untitled list of faculty members, country of birth, present citizenship, and citizenship at birth;
4. Evaluations of Montbertrand's writings from four outside professors identified by name and college or university;
5. Faculty merit evaluation forms for Montbertrand;
6. Correspondence relative to Montbertrand's tenure denial;
7. January 21, 1981, letter from College President to Montbertrand discussing the fact that deficiencies in scholarship and general contributions were not offset by governance performance in other areas;
8. Handbook of College;
9. Faculty Handbook 1978;
10. Inter-office Memo from Chairman of French and Italian Departments, Angela Jeannet, to Professional Standards Committee, January 1980, regarding Third Year review of Montbertrand. The Memo provides information on work performance, publications, grants, professional activities, participation in college and department activities, and evaluation recommending Montbertrand for tenure with attached reappointment of probationary faculty.
11. COTE form results (Student Evaluations of Teaching Effectiveness);
12. Grade surveys;
13. Enrollment data;
14. Recommendations of Professional Standards Committee in each tenure case; and
15. Actions taken by the President in each tenure case.

and legal basis to warrant the serious intrusion into the College's tenure review process in other cases. At a very minimum, the district court should satisfy itself of the necessity to breach the wall of confidentiality obviously present on this small campus.

## II.

Colleges and universities occupy a unique position in our society. They are not commercial employers; they are not government agencies. Perhaps more than any other institution, they embody and promote under the rubric of academic freedom our cherished values of free inquiry and robust debate on a variety of subjects. As the majority correctly observe, academic freedom has constitutional underpinnings. "[T]hough not a specifically enumerated constitutional right, [academic freedom] long has been viewed as a special concern of the First Amendment." *Regents of the University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978) (Powell, J., plurality opinion). The majority further note that "central to the determination of 'who may teach,' or who will receive tenure, has been the system of peer review by confidential evaluations and recommendations of tenured faculty." Maj. op. typescript at 114. Recognizing these crucial factors, the majority then analyze the legislative history of Title VII and conclude that this history somehow eradicates the importance of confidentiality in peer evaluations when the EEOC subpoenas documents generated in the tenure review process. The majority's analysis and application of legislative history to support the wholesale disclosure of all confidential materials simply proves too much.

The cited legislative history convincingly demonstrates that Congress intended Title VII to apply to universities and colleges. No one can argue to the contrary. The majority nonetheless rest their *ratio decidendi* entirely upon an analysis of the 1972 amendment to Title VII that eliminated the exemption for academic institutions. We are thus treated to a classic fallacy of irrelevance, or *ignoratio elenchi.* The error is made by attempting to prove something that has not been denied, to-wit that the 1972 amendment to Title VII took in institutions of higher learning. The question under consideration, however, is not whether Title VII was so amended but whether, on the strength of a mere conclusory allegation of discrimination, the EEOC is permitted the kind of intrusion into the tenure review process it seeks here. I find no support in the legislative history for the proposition that Congress foresaw the possibility, much less intended, that a college instructor may, with a blunderbuss allegation of discriminatory treatment against Frenchmen, devoid of factual specificity, gain unfettered access to the confidential personnel files of all his colleagues. The troublesome and recurring problem of statutory voids was recognized many decades ago by John Chipman Gray:

> The fact is that the difficulties of so-called interpretation arise when the legislation has no meaning at all; when the question which is raised in the statute never occurred to it; when what the judges have to do is, not to determine what the Legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present.[3]

At bottom always is the task of divining the intention of the legislature. Learned Hand has observed:

> When a judge tries to find out what the government would have intended which it did not say, he puts into its mouth things which he thinks it ought to have said, and that is very close to substituting what he himself thinks right.... Nobody does this exactly right; great judges do it better than the rest of us. It is necessary that someone shall do it,

---

3. J.C. Gray, *Nature and Sources of Law* 172–73 (2d ed. 1921).

if we are to realize the hope that we can collectively rule ourselves.[4]

Such an approach requires us to decide if Congress in fact intended a massive, uncontrolled intrusion into the rights of privacy and confidentiality implicated in the tenure review process of innocent third parties. I do not think so. I believe that the congressional intent to eliminate employment discrimination can be fully served without conferring on the EEOC such absolute and unyielding investigatory powers to embark upon a fishing expedition into confidential materials. Discovery expeditions into records of commerce and industry implicate only money and time; they do not implicate confidential evaluations of professional performance uttered by intimate peers with the expectation of privacy.

### III.

I do not agree with the majority's assumption that academic institutions are the same as any other employer. At least insofar as their administrative and governance structures are concerned, colleges and universities differ significantly from garden variety private employers.[5] In the context of application of the provisions of the National Labor Relations Act the Supreme Court has counseled that "principles developed for use in the industrial setting cannot be 'imposed blindly on the academic world.'" *NLRB v. Yeshiva University*, 444 U.S. 672, 681, 100 S.Ct. 856, 861, 63 L.Ed.2d 115 (1980) (citation omitted). The unique characteristics of the tenure review process led the court in *EEOC v. University Of Notre Dame Du Lac*, 715 F.2d 331 (7th Cir.1983), to recognize a qualified academic review privilege. In *Notre Dame*, the court stated:

It is clear that the peer review process is essential to the very lifeblood and heartbeat of academic excellence and plays a most vital role in the proper and efficient functioning of our nation's colleges and universities. The process of peer evaluation has evolved as the best and most reliable method of promoting academic excellence and freedom by assuring that faculty tenure decisions will be made objectively on the basis of frank and unrestrained critiques and discussions of a candidate's academic qualifications. *See Johnson v. University of Pittsburgh*, 435 F.Supp. 1328 (W.D.Pa. 1977). Moreover, it is evident that confidentiality is absolutely essential to the proper functioning of the faculty tenure review process. The tenure review process requires that written and oral evaluations submitted by academicians be completely candid, critical, objective and thorough in order that the University might grant tenure only to the most qualified candidates based on merit and ability to work effectively with colleagues, students, and the administration. For these reasons, academicians who are selected to evaluate their peers for tenure have, since the inception of the academic tenure concept, been assured that their critiques and discussions will remain confidential. Without this assurance of confidentiality, academicians will be reluctant to offer candid and frank evaluations in the future.

*Id.* at 336.

### IV.

In a subpoena enforcement proceeding the court should abjure rote application of dogma against a small college. Rather it should engage in a balancing analysis that will accord sufficient weight to the valid and competing interests at issue. The court must avoid slavish allegiance to conceptual jurisprudence, the now-discredited *Begriffsjurisprudenz*, the target of our great masters, Holmes, Pound, and Cardozo; rather, the court should always consider the decision's consequence upon the social order. The judiciary has an obligation to accommodate, whenever possible, competing interests without adopting a "zero sum" decisional structure that permits the reckless advancement of one interest irrespective of destruction wreaked upon other

---

4. L. Hand, *The Spirit of Liberty* 100, 109–110 (2d ed. 1954).

5. [A]uthority in the typical "mature" private university is divided between a central administration and one or more collegial bodies.... This system of "shared authority" evolved from the medieval model of collegial decision-making in which guilds of scholars were responsible only to themselves.... At early universities, the faculty were the school. Although faculties have been subject to external control in the United States since colonial times, ... traditions of collegiality continue to play a significant role at many universities....

*NLRB v. Yeshiva University*, 444 U.S. 672, 680, 100 S.Ct. 856, 861, 63 L.Ed.2d 115 (1979).

salutory competing interests. Yet the majority refuse to undertake this balancing analysis, opting instead to assert that somehow the legislative history of Title VII compels intrusion into the peer review system in every tenure decision made by the institution. At this time, it is not necessary for me to reach the question whether there is an academic review privilege, *see EEOC v. University of Notre Dame Du lac*, 715 F.2d 331 (7th Cir.1983). In this case, I am completely comfortable with the approach adopted in *Gray v. Board of Higher Education*, 692 F.2d 901, 903 (2d Cir.1982), in a discovery context:

> Any finding that information is protected from discovery must reflect a balancing between, on the one hand, the parties' right to discovery, which stems from society's interest in a full and fair adjudication of the issues involved in litigation and, on the other hand, the existence of a societal interest in protecting the confidentiality of certain disclosures made within the context of certain relationships of acknowledged social value.

Extended logically, the majority's absolutist approach elevates the ethereal factor of relevancy as the only restraint on the EEOC subpoena process. At the administrative subpoena level there is absolutely no limitation to what is or is not relevant. There is no complaint filed in the district court, no factual averments of "a short and plain statement of the claim," as required by Rule 8, Federal Rules of Civil Procedure, no stated boundaries to the allegation of discrimination. To accept the majority's formulation is to indulge in a classic Catch-22: "In discovery we have the right to examine anything that is relevant, but we can't tell what is relevant until we finish our discovery." Because of the danger of harm created by the rupture of confidentiality, we cannot lend jurisprudential dignity to Tweedledee's soliloquy: "If it was so, it might be; and if it were so, it would be; but as it isn't, it ain't. That's logic." [6]

### V.

I now turn to the various subpoena requests. I agree that Montbertrand's tenure review files should be produced with the names and other identifying criteria redacted. But records and documents pertaining to other faculty members, who were granted or denied tenure since November 7, 1977, implicate compelling confidentiality interests of strangers to these proceedings. Requests for these materials must first be evaluated by the district court in light of the considerable data already provided to the EEOC by Franklin and Marshall and by the data contained in Montbertrand's tenure file. Unless these documents disclose some modicum of substance to Montbertrand's claim of national origin discrimination, and some indication that these additional materials will prove the claim, we should not permit the serious violation of other faculty members' confidentiality that production of records will entail. Because the district court did not engage in this analysis, I would remand for appropriate findings.

To be sure, the EEOC is not required to establish a prima facie case in behalf of Montbertrand as a prerequisite to compelled production of documents. The majority properly cite *EEOC v. Shell Oil Co.*, 446 U.S. 54, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984), for the proposition that in a subpoena enforcement proceeding the EEOC need not establish that the charge is "well founded, verifiable, or based on reasonable suspicison." But the question here is not the *quality* of the factual predicate underlying the claim, but it is whether *any* factual predicate whatsoever is present to merit the assault on the confidential files of innocent strangers to this proceeding.

What I propose, congruent with the Second Circuit's approach in *Gray*, is a flexible, case by case approach that puts a modest burden on the EEOC whenever its request impinges upon "the confidentiality of certain disclosures made within the context of certain relationships of acknowledged social value." *Gray*, 692 F.2d at 903. At a minimum, based on materials already discussed such as in this case, the EEOC should be required to set forth a justificatory factual predicate for the confidentiality or privacy intrusions instead of naked conclusory allegations. Where, as here, confidentiality expectations of strangers are implicated, the subpoena should not, without court approval, be used as a tool in search of that predicate at the expense of privacy rights of innocent parties and of the integrity of the tenure review process.

---

6. L. Carroll, Through the Looking Glass, Chap. 4.

STATEMENT SUR DENIAL OF
PETITION FOR REHEARING

ADAMS, Acting Chief Judge.

I would grant rehearing in banc because of the significant First Amendment implications this case holds for our colleges and universities as well as the division among the circuit courts of appeals. Federal court review of university decisions carries serious consequences for academic freedom. *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Galda v. Rutgers*, 772 F.2d 1060 (3d Cir. 1985) (Adams, J., dissenting). The tenure decision at issue here reduces in essence to the faculty's determination of who may teach, one of what Justice Frankfurter referred to as " 'the four essential freedoms of a university.' " *Sweezy*, 354 U.S. at 263, 77 S.Ct. at 1218. Yet the discovery order upheld by the panel allows for a broad sweep of files revealing the internal debate over tenure votes, without any demonstration of special need. In recognition of the threat this may pose to unrestrained discussion within the academic community, two other circuit courts of appeals have fashioned contrasting approaches to that adopted by the panel here. Given this split in authority, and given the importance of the issue, I believe the matter merits the consideration of the entire court.